**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**ALEXIS A. LIEN, OSB #110569**
alexis.lien@usdoj.gov
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, Oregon  97204-2902
Telephone: (503) 727-1000
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:19-cv-01473-BR |
| **Plaintiff,** | |
| **v.** | **COMPLAINT,** *in rem*, **FOR FORFEITURE** |
| **$36,000.00 UNITED STATES CURRENCY and $18,000.00 UNITED STATES CURRENCY,** *in rem*, | |
| **Defendants.** | |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Alexis A. Lien, Assistant United States Attorney, for its Complaint *in rem*

for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to

21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

**Complaint** *in rem* **for Forfeiture**                                              **Page 1**

II.

Defendants, *in rem*, $36,000.00 and $18,000.00 in United States currency, were seized in the District of Oregon, and are now and during the pendency of this action will be within the jurisdiction of this Court.

III.

Defendants, *in rem*, $36,000.00 and $18,000.00 in United States currency, represent proceeds traceable to an exchange for controlled substances or were used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 801, *et. seq.*, and are forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the Declaration of Special Agent Ryan Parton, Federal Bureau of Investigation, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, Plaintiff, United States of America, prays that due process issue to enforce the forfeiture of Defendants, *in rem*, $36,000.00 and $18,000.00 in United States currency, that due notice be given to all interested persons to appear and show cause why forfeiture of these Defendants, *in rem*, should not be decreed; that due proceedings be had thereon; that these Defendants be forfeited to the United States; that the Plaintiff United States of America be awarded its costs and disbursements incurred in this action.

Dated this 12th day of September 2019.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Alexis A. Lien*
ALEXIS A. LIEN

**Complaint *in rem* for Forfeiture**                                                                 **Page 2**

**VERIFICATION**

I, RYAN PARTON, declare, under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Special Agent with the Federal Bureau of Investigation, and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.

*/s/ Ryan Parton*
RYAN PARTON
Special Agent
Federal Bureau of Investigation

**Complaint *in rem* for Forfeiture**                                                                 **Page 3**

## DECLARATION OF RYAN E. PARTON

I, Ryan E. Parton, do hereby declare:

## PURPOSE OF THIS DECLARATION

1.      This declaration is submitted in support of a complaint for forfeiture. The information contained in this declaration is based on an investigation conducted by Federal Bureau of Investigation Special Agent Ryan E. Parton, which will show that $36,000.00 in U.S. currency seized from Oscar Candelario and $18,000.00 in United States Currency that was seized from his travel companion, James Stembridge, at the Portland International Airport on May 9, 2018, is subject to forfeiture pursuant to 21 U.S.C § 881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq*. Information contained in this declaration is based upon my personal observations, training, and experience, and that of other law enforcement officers. This declaration does not contain each and every fact that I know about this investigation, only those necessary to establish probable cause to believe the seized currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## AGENT BACKGROUND AND TRAINING

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2012.  As a Special Agent with the FBI, my duties and responsibilities have included conducting criminal investigations for possible violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code.  I am currently assigned to the Portland Regional Organized Crime and Drug Task Force (PDX-TF).  PDX-TF is a coordinated effort by local and federal law enforcement officials to reduce illegal drug trafficking

**Declaration of Ryan Parton**

and related crimes in the Portland metropolitan area, specifically those areas directly related to air transportation.

3.      Between July of 2012 and December of 2012, I received extensive training at the FBI Academy, Quantico, Virginia, which included topics related to the methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; the use of wiretaps; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits; the use of assets to facilitate unlawful drug trafficking activity; the laws permitting forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug trafficking offenses; and money laundering investigations.  I have become familiar with the types and amounts of profits made by dealers and distributors of controlled substances, and the methods, language, and terms which are used to disguise the source and nature of the profits from their illegal drug trafficking.  I have received additional formal training from the Oregon Narcotics Enforcement Association (ONEA), the International Narcotics Investigations Association (INIA), and the El Paso Intelligence Center's JETWAY Interdiction Training program, which all focused on drug and bulk cash smuggling occurring within mass transportation systems.

4.      Prior to being employed with the FBI, I was employed by the City of Cheyenne, Wyoming as a Police Officer for approximately seven years.  During that time, I obtained a Professional Peace Officer certification through the Wyoming Police Officer's Standards Board.  To obtain this certification I was required to complete over 1000 hours of law enforcement training.  This training included, but was not limited to, legal process, narcotics investigations, narcotics identification, narcotics interdiction techniques, and interview and interrogation techniques.

**Declaration of Ryan Parton**                                    EXHIBIT A  PAGE 2
                                                                   Complaint *In Rem*
                                                                   FOR FORFEITURE

5.      I have participated in numerous narcotics investigations and search warrants seeking evidence of violations of Title 21 and Title 18 of the United States Code and violations of Chapter 475 (Controlled Substances) of the Oregon Revised Statutes (ORS).  These warrants covered the search of locations to include: electronic communication devices; residences of drug traffickers and their co-conspirators/associates; drug manufacturing operations; and stash houses used as storage and distribution points for controlled substances and/or drug trafficking proceeds.

## BACKGROUND ON NARCOTICS PROCEEDS TRANSPORTED THROUGH AIRPORTS

6.      I know from my training and experience that drug traffickers transporting narcotics proceeds will frequently use airports to transport proceeds to a source city in order to purchase controlled substances, including marijuana, cocaine, heroin and methamphetamine.  I know from my training and experience that subjects trafficking narcotics proceeds often use airports to transport proceeds because of the speed of travel, the ability to maintain custody of the proceeds, and the low detection rate by law enforcement. I know from training and discussions with other law enforcement officers that these controlled substances and proceeds of the illegal sale of controlled substances are often found during airport interdictions.

7.      Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know Oregon is a marijuana source state for controlled substances to destination locations across the United States.  Current Oregon state laws permitting the recreational and medical growth, purchase, and possession of marijuana provide individuals with significant quantities of marijuana, which can be illegally shipped to other states where marijuana is illegal or less available in order to derive substantially increased profits.

**Declaration of Ryan Parton**                                      EXHIBIT A   PAGE 3
                                                                    Complaint *In Rem*
                                                                    FOR FORFEITURE

8.    Based on my experience, training and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when drug traffickers book airline travel for the purpose of purchasing narcotics. These travel indicators are inconsistent with normal travel and would only be justified under extraordinary circumstances.

9.    I know from my training and experience that drug traffickers will book their airline travel the same day or several days before their travel. This is often done because the availability of narcotics and narcotics proceeds changes on short notice. Drug traffickers have narrow windows to conduct drug transactions when a source of supply obtains narcotics. Otherwise the source will find another buyer.

10.    I know from my training and experience that drug traffickers will book one-way travel or have short turn around flights. This is commonly done because drug traffickers are delivering narcotics proceeds to their source of supply (and do not require a lot of time at their destination) or the drug trafficker is planning on transporting the purchased narcotics by car/train back to their originating city.

11.    I know from my training and experience that drug traffickers will transport their narcotics proceeds in carry-on bags or concealed within natural voids inside checked luggage. Drug traffickers know that law enforcement passenger and luggage screening is most thoroughly done when passengers are entering the airport terminal and that there is less stringent screening of checked luggage. Therefore, in my experience, the larger seizures of narcotics proceeds found in airports are typically concealed within checked baggage. Drug traffickers believe that their greatest threat for detection of narcotics proceeds within checked bags is from x-ray screening. For that reason, drug traffickers will often wrap currency in mylar to prevent detection by x-ray machines.

**Declaration of Ryan Parton**                                    EXHIBIT A  PAGE 4
                                                                 Complaint *In Rem*
                                                                 FOR FORFEITURE

## SUMMARY OF INVESTIGATION

12.    On May 9, 2018, members of the Portland Regional Drug and Organized Crime Task Force (hereinafter "PDX-TF") were conducting standard interdiction operations at Portland International Airport.  This specific interdiction operation focused on passengers who arrived on American Airlines flight 1428 which originated in Chicago, Illinois and arrived in Portland, Oregon at approximately 1300 hours.

13.    During this operation, PDX-TF investigators Mathew Fromme and Timothy Osorio were dressed in civilian clothing.  Multnomah County Sheriff's Office K9 Deputy Bobby O'Donnell was also wearing civilian clothing but with his department issued police vest with markings and badge.  Deputy O'Donnell's police K9 "Spencer" also wore a vest which prominently displayed "Sheriff's K9."

14.    At approximately 1313 hours Deputy O'Donnell began contacting passengers deplaning from the American Airlines flight and asked for consent to allow K9 Spencer to "sniff" the luggage carried by the passengers.  K9 Spencer sniffed approximately 10 bags with no alerts.

15.  Deputy O'Donnell's official police report states the following:

> As a male passenger was exiting the plane he looked at me and held his breath as he clutched his white duffel bag.  Often times this behavior is called indexing.  The passenger changed directions walked away from the general flow and walked towards the "flight board" then walked into the bathroom.  I have seen this subconscious behavior before while conducting drug interdictions missions at the airport.  Passengers who are carrying contraband avoid walking past my drug K9.  When I have interviewed those subjects they have consistently told me that they "knew" that my K9 would smell the drugs in their bag if they came near us.
>
> I notified Det. Fromme and Osorio to watch the subject, I continued to run the flight.  I ran approximately 20 more passenger with no change of behavior.
>
> I saw the subject exit the rest room, look at me, pause and then lean up next to the wall.

**Declaration of Ryan Parton**                    EXHIBIT A  PAGE 5
                                        *Complaint In Rem*
                                        FOR FORFEITURE

I continued to walk towards him and asked if my Drug K9 could smell his bag that was lying on the ground next to him. He replied, "Yes". While sniffing a backpack, K9 Spencer's tail began to wag rapidly and his breathing became more focused and intense. I've only seen this behavior from him during certifications, training, and field deployments where the presence of drug odor was confirmed. K9 Spencer "sucked and purged" on the backpack. He then sat down quickly behind the passenger. It was like he was shocked with a jolt of electricity. I have seen this change in behavior and that final response to the odor of drugs, thousands of times in both training and "real life" deployments.

16.     Deputy O'Donnell immediately notified PDX-TF investigators of the alert. PDX-TF investigators Fromme and Osorio contacted the person in physical control of the luggage K9 Spencer alerted to. Investigators identified themselves as law enforcement and informed the passenger that investigators contacted him based on the K9 alert on his carry-on luggage. The passenger was identified as Oscar Candelario. Upon contacting Candelario, investigators quickly determined he was traveling with a second person named James Stembridge. Deputy O'Donnell contacted Stembridge, who consented to the sniff of his carry-on luggage. K9 "Spencer" again alerted to the odor of narcotic emanating from the luggage.

17.     A non-custodial interview of Candelario was conducted by TFO Osorio while TFO Fromme contacted and interviewed Stembridge. During the interview, Candelario informed TFO Osorio that he was carrying approximately $20,000.00 in United States currency and it was contained within his carry-on luggage. Candelario then stated it was closer to $25,000.00 in United States currency. Candelario consented to the search of his luggage. As indicated by Candelario, TFO Osorio located several stacks of US currency concealed within clothing items contained in Candelario's carry-on luggage. The amount found within Candelario's luggage was $36,000.00 in United States currency. With verbal consent given by Stembridge, a search was conducted on Stembridge's carry-on luggage. Found within the luggage was $18,000 in United States currency.

**Declaration of Ryan Parton**

Stembridge denied ownership of the money and stated Candelario gave it to him to transport because "…Candelario thought $54,000 was too much for one person to hold." Stembridge claimed not to know where the money was obtained from or what it was to be used for.

18.      I know from my training and experience that, when contacted by law enforcement, drug traffickers carrying narcotics proceeds will be deceptive about the amount of currency they are carrying. Drug traffickers usually underestimate or are evasive about the quantity of the currency they are carrying because they are aware law enforcement can seize narcotics proceeds. Drug traffickers usually believe that if they are in possession of a lesser amount of currency that it is less likely to be seized by law enforcement. It is common for drug traffickers carrying narcotics proceeds to change their statements regarding the amount of currency that they are carrying several times. Often drug traffickers will report they have less than $10,000.00 in United States currency because they assume international requirements to report cash valued over $10,000.00 in United States currency also applies for domestic travel. Drug traffickers engaged in money smuggling activities will also provide inaccurate amounts in an attempt to limit law enforcement's search of the container in which the money is concealed. For example, the subject claims to be in possession of $5,000.00 in United States currency, the subject hopes that once the officer searches the bag and finds the reported $5,000.00 in United States currency, the officer will then terminate the search resulting in other concealed money being overlooked. In some cases, drug traffickers engaged in these activities will provide inaccurate amounts of currency because they themselves are unaware of how much money they are transporting.

19.      During the interview, Candelario was further asked about his trip. Candelario stated he had flown with Stembridge from Orlando, Florida. Candelario had purchased the round

**Declaration of Ryan Parton**                                    EXHIBIT A  PAGE 7
                                                                 Complaint *In Rem*
                                                                 FOR FORFEITURE

trip airfare two days prior to flying.  When asked about the nature of his visit, Candelario stated

he was here to visit family who resided in Tacoma, Washington.  Candelario further stated the

purpose of the money was to purchase a vehicle at a local auto auction.  Candelario was unable to

provide any information about where and when the auction was set to occur or the type of vehicle

he was interested in purchasing.

20.     TFO Osorio inquired about Candelario's employment.  Candelario stated for the

last two years he was part owner of a landscaping business named "Lawn Enforcement Authority

Landscaping."  During this time, Candelario had not filed personal taxes and was unable to inform

TFO Osorio what his yearly salary was.  However, Candelario did state Lawn Enforcement

Authority Landscaping made approximately $90,000.00 in United States currency in revenue

during 2017.  During the interview, Candelario stated some of the money currently in his

possession was from the business account and the remainder was money he had saved.  Candelario

was unable to provide any banking information to show the removal of the funds from a business

account or Candelario's personal account.

21.     Candelario was asked if he had any communications on his cell phone, such as an

email or text, between him and his employer or others that would verify or validate his story.

Candelario stated he did not.  Detective Osorio asked the name of the "family" Candelario was

visiting in Tacoma.  Candelario responded with the name "Omar."  Detective Osorio asked for

consent to view Candelario's current texts and pictures on his cell phone.  Candelario allowed

Detective Osorio to view the requested information.

**Declaration of Ryan Parton**

EXHIBIT A   PAGE 8
Complaint *In Rem*
FOR FORFEITURE

22.     Detective Osorio's police report documented the following observations:

I located a text conversation between Mr. Candelario and Omar where I observed text conversations discussing the purchase of bulk marijuana, price for bulk quantities of marijuana, and pictures of marijuana bud.  Among the texts between Mr. Candelario and Omar I located the following conversation dated "Friday 11:22" where Mr. Candelario stated "Yo U have pics of that product.  I'm trying to book tickets.  I'm shopping with my boy in Cali but I'm curious to see ur people first but the trip from u to Cali is 14-17 hrs".  Omar later responds on the text conversation "He saying for like from 8k to 75 gets you a 5 pack".  Mr. Candelario replied "What if I need like 20, 30", "$ talks bro lmao, "Need to know how much you trying to get so my dude can get prepared.  Start with 10 and then work your way up", "Nah I don't need 10 bro, I need like 20-30, maybe even 40".

23.     TFO Osorio confronted Candelario with the information found within the text messages.  Candelario admitted to traveling to Oregon to purchase illegal bulk marijuana.  Candelario verified that the numbers "20-30, maybe even 40" was the amount in pounds of marijuana he was seeking to purchase.

24.     At approximately 1337 hours on May 9, 2018, Deputy O'Donnell was asked to "run" the cash that was found in Candelario's carry-on luggage.  Prior to running K9 Spencer on the target bags, the affiant set up a "line" of bags in similar size and appearance. The bags were placed on the ground outside of gate C22. Deputy O'Donnell used K9 Spencer to "proof" the bags, the area and a bag containing clean shredded U.S. Currency.  K9 Spencer had no change of behavior during that deployment.

25.     With no alerts to the blank bags, clean shredded U.S. Currency, or the areas where the deployment occurred, TFO Osorio set a "line" in the same areas.  TFO Osorio placed the target bag, which contained Candelario's currency, in a random spot in the "line" that would be unknown to both Deputy O'Donnell and K9 Spencer.  Deputy O'Donnell ran the "line-up blind," meaning

that he did not know the location of the subject U.S. currency.  TFO Osorio also stood out of Deputy O'Donnell's field of view to avoid him "cueing" him or K9 Spencer.

26.    At approximately 1337 hours, Deputy O'Donnell deployed K9 Spencer on the line up.  Deputy O'Donnell recorded the results in his official police report as follows:

> As he approached bag #3, I saw K9 Spencer have a change of behavior. His tail began to wag rapidly and his breathing became more focused and intense. I've only seen this behavior from him during certifications, training and field deployments where the presence of drug odor was confirmed.  I heard him "suck and purge" and then sit down quickly. I have seen this change in behavior and that final response to the odor of drugs thousands of times in both training and "real life" deployments.

> I "paid" K9 Spencer with his jute toy. I told Det. Osorio of the alert to bag #3. I was told that bag was the target bag. It should be noted that the bag containing the circulated U.S. Currency was in position #1.

27.    Based on the totality of the circumstances, the information learned from interviewing Candelario, and the information observed within Candelario's cell phone, I believe the seized currency was proceeds from illegal activity and/or was used or intended to be used to facility illegal activity. The currency was administratively seized by the FBI and Candelario was issued a receipt for the seized currency.

**CONCLUSION**

28.    Based on the foregoing information, I have probable cause to believe, and do believe, that the $36,000 in U.S. currency seized from Oscar Candelario and the $18,000.00 in United States Currency that was seized from his travel companion, James Stembridge, is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C § 801, *et. seq*.

**Declaration of Ryan Parton**

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Executed this 12th day of September 2019.


*/s/ Ryan E. Parton*
RYAN E. PARTON
Special Agent
Federal Bureau of Investigation

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II.  BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
       Plaintiff

☐ 3   Federal Question
       (U.S. Government Not a Party)

☐ 2   U.S. Government
       Defendant

☐ 4   Diversity
       (Indicate Citizenship of Parties in Item III)

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V.  ORIGIN   (Place an "X" in One Box Only)

☐ 1   Original
       Proceeding

☐ 2   Removed from
       State Court

☐ 3   Remanded from
       Appellate Court

☐ 4   Reinstated or
       Reopened

☐ 5   Transferred from
       another district
       (specify)

☐ 6   Multidistrict
       Litigation

☐ 7   Appeal to District
       Judge from
       Magistrate
       Judgment

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII.  REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII.  RELATED CASE(S)
IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____